

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-77,088

**GARY DAVID GREEN, Appellant**

**v.**

**THE STATE OF TEXAS**

ON DIRECT APPEAL FROM CAUSE NO. 19FC-1013C
IN THE 94TH JUDICIAL DISTRICT COURT
NUECES COUNTY

KEEL, J., delivered the opinion of the Court in which SCHENCK, P.J., and RICHARDSON, NEWELL, WALKER, MCCLURE, and PARKER, JJ., joined, and in which FINLEY, J., joined except as to Part VIII, in which he concurred. YEARY, J. concurred.

## O P I N I O N

After a series of venue changes, a Nueces County jury convicted Appellant of capital murder for fatally shooting an Upton County Sheriff's Deputy. *See* TEX. PENAL CODE § 19.03(a)(1). Based on the jury's answers to the special issues in the punishment phase, the trial court sentenced him to death. *See* TEX. CODE CRIM. PROC. art. 37.071, §

2(g).[1]  Appellant raises two points of error challenging his conviction and seven challenging his sentence.  We affirm the trial court's judgment and sentence.

## I.    Overview

After stealing a pickup truck and gun from a ranch in Odessa, Appellant was stranded at a convenience store in McCamey.  He drew attention to himself by, among other things, parking for a long time at the store's gas pumps and begging store clerks for free gas.  When Upton County sheriff's deputies Thomas Stiles and Billy Kennedy began to investigate the situation, Appellant instigated a shootout in which he killed Kennedy.

## II.    Point of Error 1:  No LIO Instruction

In his first point of error, Appellant argues that the trial court reversibly erred in refusing to instruct the jury on the lesser-included offense ("LIO") of murder.  He argues that a juror could have had a reasonable doubt about whether Appellant knew that the victim was a peace officer when he killed him.  We reject this point because Appellant did not preserve it, and even if he had, the trial court did not err in refusing the instruction.

### A.    Preservation

A trial court is statutorily obligated to instruct the jury on the "law applicable to the case."  *See* Art. 36.14.  LIO instructions, however, are not "law applicable" absent a proper request because their desirability often depends on trial strategy and tactics.  *Williams v. State*, 662 S.W.3d 452, 461 (Tex. Crim. App. 2021).  "Accordingly, it is

---

[1] Unless otherwise indicated, all subsequent citations in this opinion to "Article" refer to the Texas Code of Criminal Procedure.

incumbent upon defense counsel to preserve error on his requested instruction." *Id.* at 455–56; *see Posey v. State*, 966 S.W.2d 57, 61–62 (Tex. Crim. App. 1998).

To preserve error with respect to a requested LIO instruction, "the defendant must point to evidence in the record that raises" it. *Williams*, 662 S.W.3d at 461. That is, he must specify the evidence that negates the greater offense and supports the lesser. *See id.* at 462. Absent that specificity, any error in refusing the instruction would be preserved only if the specific evidence raising the LIO "is manifest." *See id.* (explaining that sometimes specific evidence raising lesser-included offense "is manifest" in context and thus need not be identified by counsel).

Appellant asserts that *Williams*'s preservation standard does not apply to him because *Williams* issued after his trial, and its retroactive application would deny him due process. But our opinions implicate anti-retroactivity principles only when they announce a "new" rule. *Salinas v. State*, 523 S.W.3d 103, 111 (Tex. Crim. App. 2017). When an opinion engages in statutory interpretation, like *Williams* did, the rule it asserts is new only if it is a "clear break" from the past. *Id.*; *see also Janecka v. State*, 937 S.W.2d 456, 461 (Tex. Crim. App. 1996) (due process may prohibit "retroactive application of an unforeseeable construction of a statute or a sudden, unanticipated change in a court made rule"). *Williams* did not announce a new rule. It followed over a hundred years of precedent that requires a defendant to specify the evidence that entitles him to requested instructions. *Mays v. State*, 318 S.W.3d 368, 384 (Tex. Crim. App. 2010); *Hampton v. State*, 109 S.W.3d 437, 441 (Tex. Crim. App. 2003); *Wilson v. State*, 189 S.W. 1071, 1072 (Tex. Crim. App. 1916).

Appellant did not specify any evidence in support of his request. Within a list of thirty-four requests and objections to the jury charge, he included two requests for a murder instruction that he claimed was necessary to protect his Sixth, Eighth, and Fourteenth Amendment rights. During the charge conference, Appellant's counsel parroted the written requests, and he did not answer the prosecutor's argument that there was no evidence to show "that the defendant didn't mean [to] kill or that the defendant didn't know that the deputy was a deputy." But neither the written requests nor their oral repetition point to any evidence that would have entitled Appellant to an instruction on murder, so his complaint was not preserved unless supporting evidence was manifest. *See Williams*, 662 S.W.3d at 461. Such evidence was not manifest because it did not exist—there was no evidence raising the LIO.

**B.      Raising an LIO**

Entitlement to an LIO instruction depends on affirmative answers to two questions. First, "are the elements of the lesser offense 'established by proof of the same or less than all the facts required to establish[ ] the commission of the offense charged'?" *Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007) (quoting Article 37.09(a)). Second, is there evidence from which a jury could rationally find that, if the defendant is guilty, he is guilty only of the LIO? *Id.* (quoting *Bignall v. State*, 887 S.W.2d 21, 23 (Tex. Crim. App. 1994). Only the second question is at issue here. *See Thomas v. State*, 701 S.W.2d 653, 656 (Tex. Crim. App. 1985) (holding that murder is an LIO of capital murder).

An affirmative answer to the guilty-only question requires evidence excluding guilt of the greater offense and demonstrating that the defendant is guilty exclusively of the lesser. *Cavazos v. State*, 382 S.W.3d 377, 385 (Tex. Crim. App. 2012); *Royster v. State*, 622 S.W.2d 442, 446-47 (Tex. Crim. App. [Panel Op.] 1981) (op. on reh'g). The evidence must negate an element of the greater offense. *Cavazos*, 382 S.W.3d at 385. A jury's ability to disbelieve evidence of the greater offense does not satisfy the guilty-only test. *Solomon v. State*, 49 S.W.3d 356, 369 (Tex. Crim. App. 2001). "This is because the disbelief of evidence is not evidence." *Chavez v. State*, 666 S.W.3d 772, 777 (Tex. Crim. App. 2023). No evidence here negated Appellant's knowledge of Kennedy's status as a peace officer.

## C.  Shootout

On the night of October 2, 2013, Adan Silvas was working as a clerk at the Stripes convenience store in McCamey when, around 9:30 PM, he noticed a red flatbed pickup truck had been parked for a long time at one of the pumps. Silvas approached the truck and talked with the driver who tried to get Silvas to give him some gas. Silvas refused, and the driver told Silvas that "it was better for [him] to go back inside." Silvas testified that "he didn't feel threatened in any way by [the driver]" but thought the comment "was just weird."

At 10:00 p.m., Silvas' shift ended, Alexis Landon came on duty, and Silvas told her about the truck before he left. Landon did not approach the car. She talked briefly with Deputy Stiles—whose wife worked at Stripes and who stopped by often—but did not discuss the idle car with him. After Stiles left, the driver of the truck entered the

store. He tried to buy several items and gas, but his debit card did not work, and he had no money. He offered Landon his debit card in exchange for the gas and merchandise. She refused that offer but gave him ten dollars' worth of free food pursuant to a company policy. He told her that he was "in hell" and that "[h]e didn't want to get [her] in trouble, but he also didn't want anybody to die either." Landon testified that she "didn't really think too much on that statement" or "think that he really meant anything." She considered him "just another customer that was upset saying things." But by about 11:00 she was concerned enough to mention the conversation to Stiles when he came back to the store with Deputy Kennedy.

After speaking to Landon, Stiles approached the truck, considering it to be a welfare concern. He encountered a man seemingly asleep in the driver's seat. Stiles knocked on the window and introduced himself as "Deputy Stiles with the Upton County Sheriff's Office." He questioned the man about where he was coming from and where he was going and asked for his driver's license. The man answered the questions and provided his driver's license. The driver's license identified the man as Gary David Green, Appellant in this case.

While Stiles was talking with Appellant, Kennedy came out of the store, stopped at his patrol SUV, and then walked over to stand next to Stiles at the driver's window where they both faced Appellant. Stiles and Kennedy then moved together to the back of the truck where Stiles contacted the dispatcher to run Appellant's driver's license and the truck's license plate. The dispatcher told Stiles that the truck had been reported stolen, Stiles told Kennedy, and Kennedy walked past the driver's door to the windshield to

check the truck's vehicle identification number. Stiles heard a gunshot and saw Kennedy "flying across the ground." Kennedy returned fire from the ground, and Appellant kept shooting at him.

Stiles pulled his gun and ordered Appellant to drop his weapon, but Appellant did not. Stiles moved toward the store for cover and fired at Appellant, and Appellant returned his fire until his gun jammed. Stiles repeatedly ordered Appellant to drop his gun and get out of the truck, but he would not. Ultimately, Stiles shot Appellant while Appellant was leaning on the armrest of the open truck door. Appellant fell to the ground, and Stiles kicked the gun away from him and went to Kennedy's aid. He performed CPR, but Kennedy was "pretty much nonresponsive" by then, and he died there.

## D.     Analysis

Appellant argues that he was entitled to the LIO instruction because a juror could have had a reasonable doubt about whether he knew Kennedy was a peace officer. He cites the "non-standard uniforms" worn by Stiles and Kennedy, the supposedly hard-to-read reflective markings on their patrol cars, and the jury's ability to reject any inference of his guilty knowledge from his initial cooperation with Stiles. But he cites no evidence negating his knowledge that Kennedy was a peace officer—he didn't testify to that, and no other evidence suggested it. *See Adanandus v. State*, 866 S.W.2d 210, 232 (Tex. Crim. App. 1993).

Both officers wore outfits with obvious indicators of their peace officer status. Kennedy wore a polo shirt that had the Upton County Sheriff's badge embroidered on the

upper right chest area, khaki pants, and a brown ball cap with "SHERIFF" emblazoned across the front, the left top side of the bill, and the back strap. Stiles wore blue jeans, an orange button up shirt, a white cowboy hat, and a metal sheriff's badge pinned to his breast pocket. Both officers drove Chevrolet Tahoes with all the trappings of a police vehicle—emergency lights, grill guard, etc.—and reflective markings reading "SHERIFF UPTON COUNTY" on the sides, "911" near the taillights, and "SHERIFF" on the back. Kennedy's uniform indicated that he was a peace officer, and no evidence suggested that Appellant did not perceive it that way. As for the reflective markings on the patrol SUV, Appellant mischaracterizes the record. Witnesses testified that they were "pretty visible," "clearly visible," and "reflective, so at night it catches your attention" and "draws your eye." One witness said that "the reflective nature [of the markings] . . . made [them] unreadable in [a] photograph" of the Tahoe. But no one said that the markings were difficult to read in person, and nothing suggested that Appellant failed to perceive them. As for the jury's ability to disregard an inference from his initial cooperation with Stiles, that ability is not evidence. *See Chavez*, 666 S.W.3d at 777; *Sweed v. State*, 351 S.W.3d 63, 68 (Tex. Crim. App. 2011) (noting that "it is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense"). Appellant points to no evidence, and we found none, that would negate his guilty knowledge that Kennedy was a peace officer.

We overrule point of error one.

## III.    Point of Error 2:  LIO Instruction Constitutionally Required

In point of error two, Appellant asserts that the trial court's refusal to submit the murder instruction violated the Eighth Amendment's prohibition on cruel and unusual

punishment and the Fourteenth Amendment's guarantee of due process. He relies on *Beck v. Alabama*, 447 U.S. 625 (1980). In *Beck*, the United States Supreme Court held unconstitutional part of Alabama's death penalty statute that automatically imposed the death penalty upon conviction and precluded the submission of instructions on LIOs. 447 U.S. at 628, 643.

*Beck* held that an LIO instruction is required only if the evidence warrants it. *Id.* at 627; *see also Hopper v. Evans*, 456 U.S. 605, 611 (1982). As previously noted, no evidence supported a murder instruction, and with no such evidence, there could be no constitutional violation under *Beck*. *See, e.g.*, *Compton v. State*, 666 S.W.3d 685, 715–19 (Tex. Crim. App. 2023), *cert. denied*, 144 S. Ct. 916 (2024) (rejecting *Beck* claim because evidence "would not have rationally supported a verdict of guilty as to murder and not guilty as to capital murder"). We overrule point of error two.

## IV. Point of Error 9: Sufficiency to Show Future Dangerousness

In point of error nine, Appellant claims that the evidence is legally insufficient to support the jury's affirmative answer to the future dangerousness special issue. *See* Art. 37.071, § 2(b)(1). Appellant argues that no reasonable jury could find he was a future danger given (1) the permanent, progressive, and disabling injuries he suffered in the shootout and (2) his inevitable incarceration in a maximum-security prison after his conviction in this case. But the jury's affirmative answer was supported by legally sufficient evidence.

### A. Standard of Review

When reviewing the sufficiency of the evidence to support the jury's affirmative future dangerousness finding, we view the evidence in the light most favorable to the verdict. *Daniel v. State*, 485 S.W.3d 24, 31 (Tex. Crim. App. 2016); *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We ask whether, based on the evidence and reasonable inferences from it, any rational trier of fact could have believed beyond a reasonable doubt that there is a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society. *Buntion v. State*, 482 S.W.3d 58, 66 (Tex. Crim. App. 2016). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. A reviewing court "does not sit as the thirteenth juror and may not substitute its judgment for that of the factfinder by reevaluating the weight and credibility of the evidence." *Garcia v. State*, 667 S.W.3d 756, 762 (Tex. Crim. App. 2023). The jury is the "sole judge" of the credibility and weight of the evidence. *Id.*

Evidence supporting an affirmative answer to the future-dangerousness issue may be found in both the guilt and punishment stages of trial. *Devoe v. State*, 354 S.W.3d 457, 462 (Tex. Crim. App. 2011); *see* Art. 37.071, § 2(d)(1). The jury may consider, among other things, the circumstances of the offense and the events surrounding it, including forethought and deliberateness in its execution; the existence and severity of past crimes; the defendant's age and personal circumstances at the time of the offense; psychiatric evidence; and character evidence. *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987); *see Wardrip v. State*, 56 S.W.3d 588, 595 n.7 (Tex. Crim. App. 2001).

It may also consider escalating patterns of violence and disrespect for the law. *See Swain v. State*, 181 S.W.3d 359, 370 (Tex. Crim. App. 2005) (citing escalating pattern of violence); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing escalating pattern of disrespect for the law).

An affirmative finding is not foreclosed by evidence of good behavior while awaiting trial or while in prison. *See Hunter v. State*, 243 S.W.3d 664, 673 (Tex. Crim. App. 2007); *Bible v. State*, 162 S.W.3d 234, 245 (Tex. Crim. App. 2005). The future-danger issue focuses on the defendant's character for violence and his internal restraints, not merely the external restraints of incarceration. *See Coble v. State*, 330 S.W.3d 253, 268–69 (Tex. Crim. App. 2010).

**B.      Evidence in Support of Finding**

1. Circumstances of the Offense

When Appellant ambushed Kennedy, he had just stolen a truck and gun from a ranch in Odessa. A jury could reasonably infer that he opened fire on the deputies when he realized that his thefts were about to be discovered. He stopped firing only when the gun he had stolen jammed, and his pre-shootout comment that he "didn't want anybody to die" could have suggested to the jury that he was contemplating murder even before the deputies approached him.

2. Prior Violence

In 1995 at age thirty-two, Appellant threatened to kill his parents and burn down their house. Five years later, Appellant again assaulted his mother, beating her so brutally that she suffered cognitive and speech problems afterwards. He was convicted of

aggravated assault for that later incident and placed on community supervision, but it was revoked and he was sentenced to ten years in prison. His parents got a protective order against him, and he violated it. They feared him so much that they got concealed-carry licenses and still had them when Appellant was tried in this case.

When his son Kyler was a young child in 2000, Kyler's mother got a protective order on behalf of Kyler and herself. In 2011, when Kyler was a teenager, Appellant tied him to a cement block and "beat him with a bull whip."

Appellant's three ex-wives testified that Appellant "beat" them "often"; he punched them with his fists all over, including on the face and head; he backhanded them, choked them, pushed them up against walls, pulled them by their hair, and repeatedly threatened to kill them. He perpetrated many of these assaults in front of children. He assaulted Kyler's mother while she was pregnant with him. During a fight with his first ex-wife, he threw a dog across the room and broke a chair across its back. He brutally assaulted his second ex-wife just months before he murdered Deputy Kennedy—nineteen years after their divorce.

Appellant was violent against non-family members, too. In high school, Appellant got into a fight at a school dance. As an adult, he assaulted a neighbor who tried to intervene when Appellant assaulted his first wife. He hit an employer's husband so hard that the man fell to the ground. In prison, he assaulted his cell mate. He repeatedly threatened to kill a man who dated his first wife while they were separated when Appellant was in jail. A friend of his testified that while Appellant was her housemate, she called 911 fearing that he and his girlfriend were going to "beat [her] up." And he set

fire to his third ex-wife's brother's trailer.

3.  Escalating Violence and Disregard for the Law

Multiple witnesses, testified that Appellant was "definitely not"—and was "everything but"—a law-abiding citizen; he was not peaceful, he "didn't follow the law," and he had a "tendency for violence." Further, these witnesses testified, and the evidence showed, that Appellant's violent behavior escalated as he aged. He was fifty when he committed this capital murder.

4.  Lack of Remorse

Appellant demonstrated a general lack of remorse while he was in a substance abuse treatment program in 2011-2012; he denied having harmed others and never expressed remorse for anything he had done. He demonstrated a similar lack of remorse about having killed Kennedy. In a phone call he made from jail while awaiting trial, he described shooting Kennedy and referred to him as "the one [he] took care of" and blamed Kennedy for provoking the confrontation and shooting first.

5.  Misbehavior in Custody

In another call made while awaiting trial for this case, Appellant admitted his guilt but schemed with a friend to influence potential jurors with a Facebook page. In another call, he bragged about fighting with his "cellie" while in TDCJ. In a call with his mother, Appellant said that he was sending a "bad bastard" to "beat the shit out of [his son Kyler]" if necessary. And, in a letter to Kyler, who was also incarcerated, Appellant advised that "a fight case sux, but there are necessary things that cannot be avoided"; and he endorsed his son's violence, expressing that "[t]he important thing is that you beat the

shit out of the other person and made the consequences worth it."

C.      Countervailing Evidence

Appellant offered a doctor's testimony about the permanent and degenerative nerve damage he suffered from his gunshot wound, his need for a walker at the time of trial, and the likelihood that he would eventually be wheelchair-bound. He presented expert testimony from Frank AuBuchon about the prison classification system and Appellant's likely classification. AuBuchon explained that the risk of violence "is a function of context" and opined that, given Appellant's physical disabilities, TDCJ would be able to manage him and minimize any chance of future violence. Appellant also offered testimony from nine jailers who said that while he was in custody awaiting trial, he was "cooperative," "very polite," "respectful," and "follow[ed] rules"; and he had no disciplinary infractions or negative interactions with law enforcement officials or fellow inmates.

D.      Analysis

The jury's affirmative answer was supported by the facts of this capital murder, its surrounding circumstances, Appellant's lack of remorse in general and his lack of remorse for this crime in particular, his blaming Kennedy for this crime, and his longstanding and escalating patterns of violence and disrespect for the law. His countervailing evidence did not render the evidence in favor of "yes" legally insufficient. The jury was free to discount it and had reasons to do so. For example, several witnesses testified that they had seen Appellant ambulate without his walker, and anyway there was nothing wrong with his hands, often his weapon of choice throughout his life. As for his

good behavior in jail while awaiting trial, he had a self-serving motivation to behave, and he undermined the weight of this good-behavior evidence by contemporaneously promoting violence to his son and scheming to influence his future jury via Facebook.

We overrule point of error nine.

## V.    Point of Error 3:  Hearsay/Excited Utterance

Appellant challenges the admission of hearsay during the punishment-phase testimony given by former Johnson County Sheriff Bob Alford.  Appellant claims that the statement does not fall under Rule 803's excited utterance exception, and the State argues in the alternative that Appellant did not preserve his complaint, the trial court did not err, and if it did err, the error was harmless.  We hold that the complaint was preserved, but the trial court did not abuse its discretion in admitting the statement.

Alford testified for the State about an incident in which law enforcement responded to the home of Appellant's parents when Appellant had assaulted his then-wife Evelyn Green and barricaded himself inside.  The Sheriff testified about his on-the-scene encounter with Bobby Green, Appellant's father  The statement in dispute was Bobby's wish that the Sheriff would kill Appellant:

> Q.    Okay.  And could you give the jury just a little bit of context about what you saw and what happened while you were there?
>
> A.    We received a call that it was a domestic issue going on, a barricaded subject, and we were told that it was [Appellant] barricaded in the house. We arrived on scene and found that

Maureen[2] had been assaulted and Bobby was -- Bobby was there and highly upset.

Q.     Okay.  Did you have a conversation with Bobby?

A.     Yes, ma'am, I did.

Q.     Okay.  Were there multiple law enforcement agencies represented in person and by their vehicles?

A.     Just us and the Godley P.D. as best I recall.

Q.     And describe Bobby's demeanor during this time.

A.     Bobby was very agitated, very upset, mad.

Q.     And what was he mad about?

A.     He was mad about [Appellant] being in the house and assaulting Maureen.

Q.     Okay.  And was he under the -- the impact of everything that was going on at the -- at that moment when you were having your conversation with him?

A.     Yes, ma'am.

Q.     And what did he say to you?

[DEFENSE COUNSEL]:   Your Honor, we're going to object to the hearsay on this.

[PROSECUTOR]:          It's an excited utterance, Your Honor.

THE COURT:               All right.  It's overruled.

Q. (BY [PROSECUTOR])  You can answer.

---

[2] In this exchange, Alford refers to Maureen, Appellant's mother, as the victim of the assault. Both parties indicate in their briefing that the sheriff mistakenly referred to Maureen when the incident involved Evelyn, Appellant's third wife.

> A.     Bobby Green looked me directly in the eye and said, "Bob, I want you to kill him."
>
> Q.     And how did you end that conversation with Bobby?
>
> A.     Well, it shocked me a man would ask you to kill his son. It really just set me back. And I just took a breath and I said, "Bobby, he's done nothing to die for today. I can't kill him."

## A.     Preservation

Hearsay complaints are generally preserved by "hearsay" objections. "Identifying challenged evidence as hearsay or as calling for hearsay should be regarded by courts at all levels as a sufficiently specific objection, except under the most unusual circumstances." *Lankston v. State*, 827 S.W.2d 907, 910 (Tex. Crim. App. 1992)); *see, e.g.*, *Cofield v. State*, 891 S.W.2d 952, 954 (Tex. Crim. App. 1994) ("Based upon the [hearsay] objection and the State's response thereto, it is obvious that the trial court and the parties were well aware that the evidence was being proffered as an exception to the hearsay rule . . . . Thus[,] the trial court was called upon to determine whether that exception applied").

Appellant's hearsay objection was sufficient to alert the trial court to his complaint, and the State's response told the trial court that the excited-utterance exception was at issue. Appellant's complaint was preserved.

## B.     Excited Utterance

An excited utterance is "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." TEX. R. EVID. 803(2). The excited-utterance exception to the hearsay rule "is based on

the assumption that the declarant is not, at the time of the statement, capable of the kind of reflection that would enable him to fabricate information." *Apolinar v. State*, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005). Its basis is psychological; "when a man is in the instant grip of violent emotion, excitement or pain, he ordinarily loses the capacity for *reflection* necessary to the fabrication of a falsehood and the 'truth will come out.'" *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003) (quoting *Evans v. State*, 480 S.W.2d 387, 389 (Tex. Crim. App. 1972)). "[T]he statement is trustworthy because it represents an event speaking through the person rather than the person speaking about the event." *Id.* at 595.

The excited-utterance exception applies if: (1) the statement is the product of an exciting or startling event that creates an emotional reaction in the declarant that renders the utterance spontaneous; (2) the emotion caused by the event is still dominating the declarant's mind so as to avoid the possibility of fabrication; and (3) the statement sufficiently relates to the circumstances of the event to ensure reliability and trustworthiness. *See McCarty v. State*, 257 S.W.3d 238, 241 (Tex. Crim. App. 2008).

A trial court's ruling on a hearsay objection is reviewed for an abuse of discretion. *Zuliani*, 97 S.W.3d at 595. It will not be reversed unless it "was so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008).

## C. Analysis

Appellant contends that the trial court erred in admitting Bobby's statement that he wanted the sheriff to kill his son. He argues that the statement was neither (1) a truly

spontaneous reaction made under the stress of excitement caused by a startling event nor (2) sufficiently related to the supposedly startling event to ensure its reliability and trustworthiness.

The record shows that law enforcement responded to a call for "a domestic issue going on" and "a barricaded subject in the house." When officers arrived, Appellant was still barricaded in the house and "Bobby was there and highly upset." Alford described Bobby as "very agitated, very upset, [and] mad"; he said Bobby was "mad about [Appellant] being in the house and assaulting [Evelyn]"; and he stated that Bobby was "under the impact of everything that was going on." From this testimony, the trial court could reasonably conclude that Bobby was under the stress of the excitement caused by the events of his son's conduct—assaulting Evelyn and barricading himself inside the home—when he made the statement to Alford. *See Coble*, 330 S.W.3d at 294 (explaining that critical question for excited utterance is "whether the declarant was still dominated by the emotion caused by the startling event when [he] spoke").

Appellant first argues that Bobby's statement was "'not a truly spontaneous reaction' in response to the purported 'startling event' . . . but rather a statement made by Bobby Green in the course of 'conversation' with Sheriff Alford." And by that time, Appellant asserts, "the supposedly 'startling event'—the altercation between Appellant and his then-wife—had already concluded and Appellant was 'barricaded' in his room."

Appellant fails to explain how the excited-utterance exception would be inapplicable to a statement made during a conversation. If he is suggesting that Bobby's statement was made in response to questioning, the record does not reflect any

questioning by Alford. Even if it did so reflect, that would not necessarily make the statement inadmissible under the excited-utterance exception. *See Zuliani*, 97 S.W.3d at 596; *McFarland v. State*, 845 S.W.2d 824, 846 (Tex. Crim. App. 1992). As for the timing of the statement, even if the assault was over, it had just occurred, and the barricading was still ongoing.

Appellant secondly argues that Bobby's statement was not sufficiently related to the startling event to ensure the reliability and trustworthiness of the statement. He contends that the statement "is simply not the kind of statement that is admissible as an excited utterance," noting that it lacked "evidentiary assertions" typically contained in excited utterances, which "usually identify a perpetrator, describe events, or contain other facts with independent evidentiary value." He asserts that the exception's "emphasis on spontaneity … makes sense when a declarant contemporaneously describes details, facts, or events" but maintains that Bobby's statement "was a statement of the person speaking about himself and his emotional response to the events that had transpired earlier."

Appellant seemingly confuses the "relatively strict requirements" of the present-sense-impression exception of Rule 803(1) with the "relatively more liberal requirements" of the exited-utterance exception of Rule 803(2). *See McCarty*, 257 S.W.3d at 239. A present sense impression is a statement made while the declarant is perceiving an event, or immediately thereafter, that *describes* or *explains* the event that prompted the statement. *See* TEX. R. EVID. 803(1). But "the excited-utterance exception is broader." *McCarty*, 257 S.W.3d at 240. Under that exception, the declarant's statement made while the declarant is experiencing the excitement caused by an event

need only *relate* to the event. *Id.* (citing TEX. R. EVID. 803(2)). Rule 803(2) does not require the declarant's statement to contain specific "evidentiary assertions" describing or explaining the event.

Bobby's statement stemmed from his "emotional response" to the assault and the barricading; the assault, at a minimum, had just happened, and the barricading was ongoing. The circumstances under which the statement was made indicate that it was prompted by—and therefore related to—those events. Consequently, it was admissible as an excited utterance, and the trial court did not abuse its discretion in admitting it. *See Zuliani*, 97 S.W.3d at 595.

We overrule point of error three.

## VI.    Point of Error 4:  Hearsay/Sixth and Eighth Amendments

In point of error four, Appellant asserts that the admission of this hearsay evidence violated the Eighth Amendment's requirement for heightened reliability in capital sentencing as well as Appellant's "fundamental rights to confrontation and cross-examination." The State contends that Appellant did not preserve this multifarious complaint for appellate review. We agree that the confrontation clause claim is inadequately briefed and address it no further. We need not decide whether Appellant may raise his heightened reliability claim for the first time on appeal since, even if he can, his claim exceeds the Eighth Amendment's protections.

In general, the Eighth Amendment is not a rule of evidence. "[I]t is not the role of the Eighth Amendment to establish a special federal code of evidence governing the admissibility of evidence at capital sentencing proceedings." *Kansas v. Carr*, 577 U.S.

108, 123 (2016) (internal quotations removed). The Eighth Amendment is "inapposite" to claims that evidence should not have been admitted, even if that evidence would "render the trial fundamentally unfair." *Id.*

Appellant argues that the hearsay statement violated the Eighth Amendment by relieving the jury of the responsibility of sentencing him to death, just like in *Caldwell v. United States*. 472 U.S. 320 (1985). But Appellant misses *Caldwell*'s explicit limits. *Caldwell* addressed a prosecutor's argument that "[the jury's] decision is not the final decision" because it would be automatically reviewed on appeal; the argument was "constitutionally impermissible" because it "led [the jury] to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472 U.S. at 328-29 (plurality opinion). But the argument was impermissible only because it was false and misleading. *Id.* at 341-43 (J. O'Connor, concurring); *see Romano v. Oklahoma*, 512 U.S. 1, 9 (1994) (J. O'Connor's position in *Caldwell* "is controlling"). The Court noted that it was permissible to give "*nonmisleading* and *accurate* information regarding the jury's role in the sentencing scheme." *Id.* To invoke *Caldwell*, a defendant must show that "the remarks to the jury improperly described the role assigned to the jury by local law." *Romano*, 512 U.S. at 9 (upholding death penalty where the jury was accurately informed that the defendant already had been sentenced to death for another crime); *see also California v. Ramos*, 463 U.S. 992 (1983) (upholding jury charge that accurately described the governor's power to pardon or commute a sentence).

Appellant's father's statement did not tell the jurors anything about their role in

the sentencing process; it certainly did not mislead them about their role. *See Romano*, 512 U.S. at 9 (the evidence was acceptable because "it was neither false at the time it was admitted, nor did it even pertain to the jury's role in the sentencing process"). The evidence showed only that during a standoff with Appellant, his father told an officer, "I want you to kill him." Maybe the jury felt less moral trepidation about sentencing Appellant to death knowing that his own father approved. But that is not the test. The test is whether the statement might mislead the jury about its role in deciding Appellant's sentence. We acknowledge that jurors often misunderstand how the criminal justice system works. *See Caldwell*, 472 U.S. at 342. But we cannot conceive how a juror may believe that the accused's father's opinion plays any role in setting the punishment for the crime. The statement at issue did not violate Appellant's Eighth Amendment rights.

We overrule point of error four.

## VII. Point of Error 5: Denial of Mistrial

In point of error five, Appellant challenges the trial court's denial of his motion for a mistrial at the punishment phase after the State introduced evidence of extraneous misconduct that was omitted from its notice of intent to admit such evidence. We overrule this point because Appellant forfeited his complaint, and it lacked merit anyway.

Moreover, even if he had preserved his complaint and even if it had had merit, the trial court would not have abused its discretion to deny the mistrial.

## A. Forfeiture of a Complaint

Two forfeitures are in play here—an untimely objection and a failure to object to some of the evidence when it was offered through another witness.

Absent a legitimate justification for the delay, an objection to testimony is untimely if it is raised after the question has been asked and answered. *Luna v. State*, 268 S.W.3d 594, 604 (Tex. Crim. App. 2008). In that event, "any claim of error is forfeited." *Id.* So it is here: Appellant did not object to the challenged testimony or move for mistrial until after the questions had been answered by Cindy Green, Appellant's second ex-wife, about their son Kyler:

> Q. Kyler, probably because of a lack of direction at times, could be difficult to raise at times, right?
>
> A. Yes, sir.
>
> Q. He had trouble with drugs?
>
> A. Yes, sir.
>
> Q. Tell the jury who introduced Kyler to drugs.
>
> A. [Appellant] did.
>
> Q. Do you remember how old he was that you first saw the Defendant smoking marijuana with Kyler?
>
> A. Kyler was nine.
>
> Q. Who was the one that introduced Kyler to the use of methamphetamine?

A.     [Appellant] did.

Q.     Do you know how old Kyler was when he first started using meth?

A.     No, sir, I don't.

[DEFENSE COUNSEL]:    Your Honor, may we approach?

At the bench, Appellant complained that the State had elicited extraneous conduct evidence without giving proper notice to the defense. His untimely complaint forfeited any error. *See id.*

Moreover, a complaint about the admission of evidence is also forfeited unless it is objected to every time it is offered. *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003). Appellant did not object when his third wife testified that Appellant smoked marijuana with Kyler. Thus, that aspect of Appellant's complaint was doubly forfeited.

Even if it had been preserved, however, his complaint lacks merit because Appellant's combination motion to the trial court and request of the State for notice of intent to offer certain evidence did not trigger the State's duty to give notice.

## B.     Unmeritorious Complaint

On "timely request" of a defendant, the State must give "reasonable notice" of its intent to introduce evidence of unadjudicated extraneous crimes or bad acts. *See* Arts. 37.071, § 2(a)(1); 37.07, § 3(g). Notice is required "only if the defendant makes a timely request to the attorney representing the state for the notice." Art. 37.07 § 3(g). To activate this notice requirement, a defendant must either serve the State with a request for notice or file a discovery motion requesting the court to order such notice and secure a ruling on the motion. *See Mitchell*, 982 S.W.2d at 427. He cannot do both. "[W]hen a

document seeks trial court action, it cannot also serve as a request for notice triggering the State's duty under Article 37.07 § 3(g)." *Id.* In other words, "when a document asks the trial court to enter an order and it also asks the State to provide notice, the document is insufficient to trigger the duty to provide notice under Art. 37.07 § 3(g)." *Id.* A contrary rule "would encourage gamesmanship" and "encourage defendants to bury requests in voluminous motions, hoping the State would either overlook" them or treat them as contingent on a court order. *Id.*

The parties agree on the identity of the operative document here, and we quote it without using all caps. The document is titled "Pretrial Motion No. 51 Request for Notice of State's Intention to Use Evidence of Extraneous Offenses at Trial." It was addressed to the trial court—"To the Honorable Judge of Said Court"—but its opening paragraph "request[ed] the District Attorney to give, in proper form, to counsel for the Accused timely notice of the proposed use of evidence, specifically:" pursuant to various rules and statutes. Each rule or statute had its own paragraph consisting of one or more incomplete sentences.

The paragraph headlined "Article 37.07" read as follows: "Pursuant to Article 37.07(g) [sic], of the Code of Criminal Procedure written reasonable notice, at least sixty (60) [sic] prior to the commencement of trial of intent to introduce evidence of extraneous crimes or bad acts as provided for in Article 37.07(3)(a) of the Code of Criminal Procedure." The paragraph headlined "Article 38.37" was an outlier in that it "move[d] the Court to order the District Attorney to give notice of his intent to use any items pursuant to Article 38.37…" The document concluded by "request[ing] that the

District Attorney provide counsel for the Accused with notices [sic] of intent to introduce evidence as specified in the request." Its certificate indicated service on the State. It did not include an order, and it was never ruled on by the trial court.

Appellant's Pretrial Motion No. 51 asked for both an order from the court and notice from the State. Consequently, it did not trigger Article 37.07's notice requirement. *See Mitchell*, 982 S.W.2d at 427. Appellant's argument that his motion "made no request of the trial court" is patently false; it asked the trial court to order the prosecution to give him notice under Article 38.37. Moreover, his document was addressed to the trial court and named itself "Pretrial Motion No. 51." Appellant's mishmash of a document failed the simple *Mitchell* rule; it combined requests of the State with a request to the court and obscured itself with its title and its hailing of the trial court. Thus, it did not trigger Article 37.07 § 3(g)'s notice requirement.

Finally, even if the State had failed in its duty to give notice, however, the trial court's denial of the mistrial motion would not have been an abuse of discretion.

## C.     No Abuse of Discretion

A mistrial is warranted "only in 'extreme circumstances' for a narrow class of highly prejudicial and incurable errors." *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). (quoting *Hawkins*, 135 S.W.3d at 77). We review the denial of a mistrial for an abuse of discretion. *Balderas v. State*, 517 S.W.3d 756, 783 (Tex. Crim. App. 2016). We must uphold the ruling if it was within the zone of reasonable disagreement. *Ocon*, 284 S.W.3d at 884. In determining whether a trial court abused its discretion in denying a mistrial, we balance three factors, tailored for punishment proceedings: "(1) the severity

of the misconduct (prejudicial effect), (2) curative measures, and (3) the certainty of the punishment assessed absent the misconduct (likelihood of the same punishment being assessed)." *Hawkins*, 135 S.W.3d at 77.

Appellant's complaint about this evidence was lack of notice, not the evidence itself. At the bench conference, the prosecutor responded to Appellant's complaint saying, "Your Honor, I apologize. It was in the discovery we complied with but it's not on the actual list. And I had thought because it was in the discovery that I'm reading from that it was on the list." Appellant did not contest the prosecutor's assertion or claim he was surprised by the evidence, nor did he ask for time to prepare for it. Instead, he requested that the topic "no longer be explored," "there be an instruction to disregard," "it be struck from the record," and he asked for a mistrial. He got most of what he asked for. The trial court instructed the State to move on and the jury to disregard the evidence but denied the mistrial.

The ruling was not an abuse of discretion. The misconduct—lack of a particular type of notice—was not prejudicial. Even so, the trial court instructed the jury to disregard the evidence. And the certainty of a death verdict would not have been reduced but for the introduction of this evidence given the balance of the punishment phase evidence.

Appellant claims that the instruction to disregard was ineffective because the evidence showed that he "introduced his nine-year-old son to drugs." That is an exaggeration. The challenged evidence showed that he introduced nine-year-old Kyler to marijuana, but Kyler's age at which Appellant introduced him to methamphetamine was

unknown. And as previously noted, the marijuana aspect of the testimony was admitted without objection through another witness.

We overrule point of error five.

## VIII. Points of Error 6 and 7: Argument Outside of the Record

In his sixth and seventh points of error, Appellant argues that the State inflamed the jury and encouraged it to punish Appellant for the crimes of others when it referred to facts outside the record in its punishment phase jury argument. The State's argument was improper, but Appellant's objection was untimely, and even if he did not forfeit the error, it was harmless even if of constitutional dimension.

### A. Argument, Objection, and Ruling

Appellant challenges the following argument made by one of the prosecutors in her closing argument:

> You know, Edmund Burke told us, "Nobody made a greater mistake than he who did nothing because he could only do a little." It's been 2,094 days since October 2nd of 2013. In that time, 31 Texas officers have died from gunfire. I segregated it out only for gunfire, from 2013 until today. That's 10 percent of the nation's officers, 309 that have died --

Appellant objected, asserting,

> It's improper argument. This case, this trial is about [Appellant's] individual as a punishment. [sic] They're calling for a community purpose with any verdict that this jury might give. This slide has nothing to do with [Appellant]. There was no evidence of this slide. It's an improper argument, and it's an attempt by the prosecutor to inflame this jury -- inflame this jury in violation of [Appellant's] rights under the Sixth and Eighth Amendment[s].

The prosecutor responded that the argument was a plea for law enforcement, and the trial court overruled the objection. Appellant's objection was untimely because he did not

make it as soon as the grounds for it were apparent. *See Montelongo v. State*, 623 S.W.3d 819, 822 (Tex. Crim. App. 2021). But even if he had preserved the claim, and even if the court erred in allowing the argument, it was harmless.

**B.     Harm**

Generally, allowing argument outside the record is non-constitutional error that must be disregarded unless it affects the defendant's "substantial rights." See *Freeman*, 340 S.W.3d at 728; *but see Milton v. State*, 572 S.W.3d 234, 241 (Tex. Crim. App. 2019) (the State may sometimes use non-record facts to make analogies, tell anecdotes, or appeal to common knowledge). Appellant claims, however, that the improper argument violated his Eighth Amendment right to individualized sentencing and should be evaluated as constitutional error. Assuming without deciding that allowing the argument was a constitutional error, it was harmless beyond a reasonable doubt.

A constitutional error is reversible unless, beyond a reasonable doubt, it did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2(a). An error does not contribute to the verdict if it is "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Yates v. Evatt*, 500 U.S. 391, 403 (1991) (disapproved of on other grounds by *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). If there is a "reasonable likelihood" that the error materially affected the jury's deliberations, then the error was not harmless beyond a reasonable doubt. *Rubio v. State*, 241 S.W.3d 1, 3 (Tex. Crim. App. 2007) (citing *Satterwhite v. Texas*, 486 U.S. 249, 256 (1988)).

In evaluating constitutional harm, we consider in a neutral light "any and every

circumstance apparent in the record that logically informs the analysis." *Hughes v. State*, 691 S.W.3d 504, 523 (Tex. Crim. App. 2024) (quoting *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011)). We do not focus on the propriety of the trial's outcome but on "the probable impact of the error on the jury in light of the other evidence." *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000). Viable considerations include the nature of the error, its emphasis by the prosecution, its probable implications, and the weight the jury likely would have given it during deliberations. *Snowden*, 353 S.W.3d at 822. "While the most significant concern must be the error and its effects, the presence of overwhelming evidence supporting the finding in question can be a factor in the evaluation of harmless error." *Wesbrook*, 29 S.W.3d at 119. The State has the burden of showing the error's harmlessness beyond a reasonable doubt. *Id.*; *Haggard v. State*, 612 S.W.3d 318, 328 (Tex. Crim. App. 2020).

In *Snowden*, the trial court overruled the defendant's objection to the prosecutor's guilt-phase argument that commented on his failure to testify in his trial for domestic violence. *Snowden*, 353 S.W.3d at 817. The prosecutor argued that he didn't "give two hoots" about the pregnant victim or the baby because he looked "her in the eye" and punched her in her pregnant stomach "without remorse, just like he is today." *Id.* Because his remorse during trial "was a circumstance that only he could have testified to[,]" the argument was an objectionable comment on his failure to testify. *Id.* at 823-24.

In addressing harm, we pointed out that part of the argument was at least partly supported by the evidence. *Id.* at 823. Specifically, the victim testified that the defendant looked her in the eye and punched her right above the belly button with a closed fist. *Id.*

We also noted that the prosecutor's later argument emphasized the defendant's lack of remorse only at the time of the assault, and the evidence supported this argument, too, without referencing the defendant's failure to testify about his lack of remorse during trial. *Id.* at 824.

We reasoned that "a jury that was legitimately invited to consider the appellant's apparent remorselessness at the time of the offense was not likely to have been substantially prejudiced by an additional comment on his present lack of remorse." *Id.* at 825. And the evidence against the defendant "was substantial, if not overwhelming." *Id.* Further, a jury that did not believe the victim would not be tempted to hold against the defendant his lack of remorse at trial, and a jury that did believe the victim "would not likely find it necessary to resort to the prejudice inherent in a comment on his failure to express courtroom remorse to convict him." *Id.* In short, the error would not have persuaded the jury on a material issue nor was it likely to have distracted the jury from its job as factfinder at the guilt phase of trial. *Id.*

*Snowden* also rejected as "exceedingly remote" the possibility that "the jury could have considered the appellant's lack of in-court remorse in some kind of subliminal way as evidence buttressing his status as a repeat family/household-violence offender." *Id.* The error was "simply 'unimportant'" compared to everything else the jury heard on the issue of the defendant's status as a repeat offender. *Id.* (quoting *Yates v. Evatt*, 500 U.S. 391, 403 (1991).

C.    **Analysis**

1.    **The statistics were brief and uninflammatory**

The prosecutor here argued unproven statistics about police officers killed in the interim between Appellant's murder of Deputy Kennedy and his trial for it. Although the statistics were outside the record, the underlying fact behind them—that law enforcement officers are killed in the line of duty—was supported by the evidence. Specifically, the defense's policing expert testified that he had attended "too many officer funerals" and "many, many funerals" of officers killed in the line of duty. Moreover, it is a matter of common knowledge that police officers are shot and killed in the line of duty. The statistics were not particularly inflammatory, and their mention was brief. Instead, the State's punishment argument focused on the reasonable probability that Appellant was a future danger. And as discussed in point of error 9, the State convincingly portrayed Appellant as a violent, unrepentant man whose dangerousness had increased over time.

By contrast, Appellant's punishment case was weak because the much of the evidence favorable to him was contradicted and/or self-serving. For example, his close family members called him a "good big brother" and an "excellent dad," but these sentiments were undercut by proof that Appellant had beaten both his mother and his son, leading to a protective order against him for their benefit. Several jailers relayed that Appellant had been respectful, polite, and cooperative while awaiting trial, but that behavior was obviously self-serving and undercut by his prior violent behavior while in jail. Two women who had short-term relationships with Appellant testified that he was a good person who never placed them in fear, and one of the women said he was a positive

influence on her child. Of course, that does little to overcome the many instances when Appellant abused his domestic partners.

Some of Appellant's evidence was not self-serving or contradicted. The defense showed that Appellant suffered severe health problems as a child, he tried to start a Narcotics Anonymous program with his local pastor, he protected the lives of cowboys as a rodeo clown, and he performed CPR on a dying stranger. But some of these events were in the distant past, whereas his violent behavior had gotten worse with time.

In short, the erroneous argument was brief, partly supported by the evidence, not particularly inflammatory, and insignificant compared to the State's otherwise strong case. *See Snowden*, 353 S.W.3d at 822. It is unlikely that the jury would have found it necessary to resort to the outside-the-record statistics to answer the special issues. *See id.* at 825. There is no reasonable likelihood that the mention of numbers of slain officers materially affected the jury's punishment deliberations.

## 2. The State did not emphasize the error

Although the State never referred to the numbers again after Appellant's objection, he claims that the State continued to "indirectly emphasize" them. *See Snowden*, 353 S.W.3d at 822. Appellant points to three statements made by the State after the objection was overruled. None of them reemphasized the extra-record statistics.

In the first instance cited by Appellant, the prosecutor said, "Don't let them down." In context, the argument was as follows with italics added to the salient comments:

Sheriff Brown told you, our jurisdiction is small; and our neighbors come to help us when we need help. We are small agencies. We know each other, and we help each other. We all knew Bubba. We miss the coffee breaks. We miss the late night phone calls asking for assistance on a case. "Hey, I've got this case. How do I need to handle it? What do I do?"

We miss his sense of humor, his steady influence, and his diligent protection while we sleep.

You know, there's no better day in a family of law enforcement folks when their loved one raises their right hand and takes the oath to serve and protect; and *there's no harder day in the life of a law enforcement family when you get that (indicating) knock on the door or that phone call that tells you that your loved one has left it all on the ground, the Stripes parking lot, or a field somewhere, on the apartment parking* lot in the middle of a domestic violence case. They left it all right there, and they will not be coming home to you. *Your children are fatherless. You have no husband. And you have to bury your son.* That is a hard, hard day.

*Saint Michael is the patron saint for law enforcement.* Every day of this trial I've carried this coin in my pocket (indicating). Today at the close of all these arguments, I pass the torch to you.

*Don't let them down.* Life without parole is not sufficient punishment for Gary David Green. You have sufficient evidence to find him – to find that he is a future danger and will aways be a future danger. From my review of the evidence, there's is [sic] nothing sufficiently mitigating. Thank you.

The reference to "them" was ambiguous. It might have referred to the other hypothetical

families whose police-officer members died on the job "in a field" or in an "apartment

parking lot." But it also might have referred to Deputy Kennedy's law enforcement

community. Or it could have referred to Deputy Kennedy's family; testimony showed

that he was survived by his widow, fatherless children, and parents. Even if "them"

referred to other fallen officers and their surviving families, it did not focus the jury's

attention on the objectionable statistics. Rather, "don't let them down" directed attention to the danger faced by law enforcement officers on the job

Appellant also argues that the "don't let them down" statement was improper by itself for suggesting the law enforcement community commands or expects the death penalty, but he raised no objection to this comment, so it is not preserved for appeal.

In the second instance cited by Appellant, the prosecutor argued, "There's one victim in this case in the murder; but as [the first prosecutor] showed you in that PowerPoint, there are so many more." Appellant claims that this statement referred to the statistics slide. The State responds that the "so many more" victims were those proven to have been victims of Appellant's prior violence. The record does not show which slide was shown, but the immediately subsequent remarks suggest that the "so many more" were Appellant's earlier victims:

> There's one victim in this case in the murder; but as Laurie showed you in that PowerPoint, *there are so many more*. I've watched you. Some of you wince when *you saw he beat his son with a bullwhip. You saw Evelyn reliving the years of abuse*. Talk about seeing someone who turned her life around who cared, who got it together. *He put Laci through a living hell in that house growing up.*

This argument was an acceptable summation of the evidence that did not redirect the jury's attention to the objectionable statistics.

Third, Appellant points to the prosecution's comment that people who murder police officers in the line of duty "don't get life without parole."

The argument was as follows:

> Their own expert, Dr. Sorensen, testified that there's really an insufficient sample of people convicted of murdering a police officer in the

line of duty serving life without parole for him to really determine. Why do you think that is? It's because they don't get life without parole. Someone who is willing to kill someone in a position of authority to get what they want is a future danger.

Sorensen testified for the defense about risk factors for violence in prison and the relatively non-violent behavior of those sentenced to life without parole for capital murder. On cross-examination, he admitted that his studies did not distinguish between capital murderers of police officers and other types of capital murderers, he conceded that only a "tiny" number of defendants were sentenced to life without parole when the State sought the death penalty, and the overwhelming number of life-without-parole sentences were assessed in cases in which the State had not sought the death penalty. So, the argument that "they don't get life without parole" was a shorthand rendition of Sorensen's testimony about his studies.

This portion of the State's argument did not emphasize the non-record statistics presented by the first prosecutor. It did the opposite. It redirected the jury's attention away from the statistics outside the record and towards the statistics in the record. Appellant notes that this portion of the argument reminded the jury about other officers killed in the line of duty, but that fact was already in the record—from the testimony offered by the defense and that the State was summarizing.

**3.** ***Lopez v. State* does not require reversal**

Appellant points to *Lopez v. State* where we reversed the defendant's death sentence after condemning an argument that might have been less prejudicial than this one. 500 S.W.2d 844, 846 (Tex. Crim. App. 1973). But before we addressed the closing

argument in *Lopez*, we first held that the statutes under which Lopez was sentenced to death were unconstitutional under *Furman v. Georgia* and *Branch v. Texas*, making our discussion of closing argument dicta. *Id.* at 845. To the extent that the discussion was not dicta, it does not foreclose our decision here. The prosecutor in *Lopez* made two improper arguments; one was that eleven other officers had been killed in the same week, and the other was that the defendant, his codefendant, and their lawyers all lied when they pled not guilty. *Id.* at 846. We held that both arguments *collectively* required reversal. *Id.* We did not say that the extra-record evidence alone justified reversal.

## D.    Conclusion

After considering "any and every circumstance apparent in the record that logically informs the analysis," *Hughes* 691 S.W.3d at 523, we conclude that the error was harmless. Compared to the ample evidence of Appellant's future dangerousness, the extra-record reference to other fallen officers was brief and uninflammatory. It is not reasonably likely that, but for the complained-of argument, the jury would have answered the special issues differently. *See Wesbrook*, 29 S.W.3d at 120 ("there is no reasonable likelihood that [unconstitutional testimony] moved the jury from a state of nonpersuasion to persuasion regarding the issue of future dangerousness"). We hold that the error was harmless beyond a reasonable doubt.

We overrule points of error six and seven.

## IX.    Point of Error 8:  Future Dangerousness Issue Unconstitutional

In point of error eight, Appellant argues that his death sentence is arbitrary and violates the Eighth and Fourteenth Amendments because it is based on the jury's

"unreliable speculation about his future behavior." He contends that the statutory future dangerousness special issue is unconstitutional because no one can reliably predict whether another person will commit acts of violence in the future.

Appellant acknowledges that the United States Supreme Court and this Court have upheld the constitutionality of the future dangerousness inquiry and rejected claims proclaiming the impossibility of predicting future behavior. *See Jurek v. Texas*, 428 U.S. 262, 274–76 (1976); *Coble*, 330 S.W.3d at 297; *see also Kennedy v. Louisiana*, 554 U.S. 407, 440 (2008) (recognizing Court's prior holding that Texas statute's inquiry into defendant's future dangerousness meets State's obligation to ensure individualized sentencing in capital murder cases). But he asserts that these decisions "depended upon 'first generation' evidence on the reliability of predicting future dangerousness." He argues that recent studies demonstrate the fallibility of such future-behavior predictions.

Appellant's claim is a facial challenge to the constitutionality of the death penalty statute, specifically, Article 37.071, Section 2(b), the future dangerousness special issue. "Statutes are presumed to be constitutional, and that presumption means that a constitutional claim against a statute—even a facial claim—must be preserved at trial." *Wood v. State*, 693 S.W.3d 308, 324 (Tex. Crim. App. 2024); *see Karenev v. State*, 281 S.W.3d 428, 434 (Tex. Crim. App. 2009) (concluding that "a defendant may not raise for the first time on appeal a facial challenge to the constitutionality of a statute"); *see also* TEX. R. APP. P. 33.1(a)(1). In the trial court, Appellant did not challenge the constitutionality of the future dangerousness special issue based on the purported

unreliability of speculating about future behavior as allegedly shown by recent studies.[3]

Accordingly, he did not preserve this claim for appellate review. We overrule point of error eight.

## X. Conclusion

We affirm the trial court's judgment of conviction and sentence of death.

Delivered: May 28, 2025

Publish

---

[3] Appellant filed several motions seeking to preclude imposition of the death penalty based on alleged constitutional defects in Texas's capital sentencing scheme. However, none challenged the constitutionality of Article 37.071 based on the purported unreliability of speculating about future behavior involved in the future dangerousness special issue.